

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FRANK CRAIG,                              )
                                          )
              Plaintiff                   )
                                          )         No. 08 C 2275
       v.                                 )
                                          )         The Honorable William J. Hibbler
                                          )
CITY OF CHICAGO, BRUCE KISCHNER,          )
PHILLIP BROWN, JOHN HILLMAN, GARY         )
HUGHES, RANDALL DARLIN, ARTHUR            )
DAVIS, PABLO MARIANO, CHRIS BLUM,         )
MATTHEW SCOTT, AND DANIEL                 )
MCNAMARA,                                 )
                                          )
              Defendants.                 )
                                          )

MEMORANDUM OPINION AND ORDER

       Frank Craig was arrested for a crime he did not commit, spent two months in jail and nearly

a year-and-a-half fighting the charges against him. After his exoneration, Craig filed this suit against

the police officers who arrested him, alleging numerous constitutional violations. The Defendants

move for summary judgment.

I. Factual Background

       On January 18, 2006 about an hour after sunset, Jose Martinez withdrew money from his

bank. (Pl. 56.1(b)(3)(B) St. (Pl. St.) ¶¶ 6,9). Shortly thereafter, as Martinez was driving away from

the bank, another vehicle rear-ended the vehicle Martinez was driving. (Def. 56.1(a)(3) St. (Def. St.

¶ 8). As Martinez exited his vehicle to inspect it for damage, the driver of the other vehicle

approached him and robbed him at gun point. (Def. St. ¶¶ 9-12). Martinez observed a passenger

1

who remained in the vehicle during the robbery and was able to identify the license plate number of the vehicle as it fled the scene of the robbery. (Pl. St. ¶¶ 10; Def. St. ¶16; Ex. B (Offense Report)). After the robber fled, Martinez called the police.

Officer Selinet Otero, who is not a defendant in this litigation, responded to Martinez's call a few minutes later. (Def. St. ¶ 12; Offense Report). Martinez provided Otero with the license plate number of the suspects' vehicle. (Def. St. ¶ 16; Offense Report). Martinez also described, only generally, the two suspects to Otero. (Offense Report). Martinez described the driver/robber as a 5'7", 170 pound, African American male in his thirties and the passenger/accomplice as an African American male in his twenties. (Offense Report). Martinez provided no identifying marks of either suspect, did not describe either suspect's complexion or hair style, and added only the detail that driver/robber wore a blue flannel jacket and a hat. (Offense Report).

Still, armed with the information about the suspects' vehicle, Defendants Matthew Scott and Daniel McNamara, who were assigned to the case from the City of Chicago's robbery and public violence team, learned that the vehicle used in the robbery was registered to a rental car company. (Def. St. ¶ 20). Scott and McNamara then learned that an individual named Jane Craig had rented the vehicle used in the robbery. (Def. St. ¶¶ 20-21; Pl. St. ¶ 13). Scott and McNamara learned that the rental agency expected Jane Craig to return the car at an airport location the next day. (Def. St. ¶¶ 20-21; Pl. St.¶ 13).

However, while Scott and McNamara were waiting for Jane Craig to return the car to the rental agency's airport location, Jane Craig instead returned the car to a downtown Chicago location. (Def. St. ¶ 22). After Jane Craig eluded them, Scott and McNamara went to the downtown location where she had returned the car. (Def. St. ¶ 23). There, Scott observed the surveillance camera video

of the persons returning the vehicle. (Def. St. ¶ 23). The surveillance video revealed two women and one African American male in his twenties returning the car. (Def. St. ¶ 23). None of these persons matched Martinez's description of the driver/robber, but the African American male in his twenties matched, Martinez's general description of the passenger/accomplice. Despite the potential that the surveillance video revealed the identity of the passenger/accomplice, Scott and McNamara did not obtain a copy of it. (Pl. St. ¶ 28). Nor did the officers maintain or create any reports or notes about their investigation into the rental car. (Pl. St. ¶ 29).

The officers continued to investigate Jane Craig. With information from the rental car agency, the officers contacted Jane Craig, who lived in California. (Def. St. ¶ 24). When Scott questioned Jane Craig about her car rental, she became evasive and verbally abusive before hanging up the telephone. (Def. St. ¶ 24; Pl. St. ¶ 31). In particular, Jane Craig avoided Scott's line of questioning about persons who might have had access to the vehicle and who might have used it to commit a crime. (Pl. St. ¶ 31). In addition, Jane Craig lied to Scott by informing him that she had been the only person to drive the vehicle (the video surveillance revealed otherwise). (Pl St. ¶ 31).

Undeterred by Jane Craig's effort to sabotage the investigation, the officers searched several databases, including voter registration databases, victim databases, and two other private databases, to gather information about her. (Def. St. ¶¶ 25-26; Pl. St. ¶ 21). Eventually, Scott and McNamara discovered a Chicago Police Department Case Incident Report filed in 2000, listing Jane Craig as a victim. (Def. St. ¶ 28). The report also listed a second victim, "Frank Craig." The report gave matching Modesto, California addresses for both Jane and Frank Craig. (Def. St. ¶ 28; Ex. C). Jane Craig had reported that a vehicle with California license plates had been stolen from the front of the

house of her sister, Betty Smith. (Def. St. Ex. C). The report provided a Chicago address for Smith, but the officers never contacted Smith to inquire about any contacts Jane Craig might have with individuals in Chicago. (Def. St. Ex. C).

Although the officers had only a California address for Frank Craig, who had appeared on a six-year-old incident report, Scott and McNamara made a grandiose leap in logic and searched for any persons in Chicago named "Frank Craig" who were African American males, as that was the only identifying feature given to them by Martinez. (Def. St. ¶ 29). That search identified the Plaintiff, who was 44 at the time. Scott and McNamara attempted to connect the Plaintiff, who resided in Chicago, to the "Frank Craig" identified as residing in California with Jane Craig, the renter of the vehicle used to commit the robbery. (Pl. St. ¶ 25). The officers, however, could find no connection between the Plaintiff Frank Craig and the Californian Frank Craig. (Pl. St. ¶ 25). And for good reason — the Californian Frank Craig (who had previously shared an address with Jane Craig) had died two years before the robbery was committed. (Pl. St. ¶ 23). Nothing about the Plaintiff Frank Craig's identifying information — including his address, phone numbers, witness and party information or arrest history — linked him in any way to Jane Craig or to Betty Smith, Jane Craig's sister. (Pl. St. ¶ 24). In fact, the officers searched Craig's arrest history, which revealed 1998 and 2005 arrests; neither arrest record revealed a California address for Craig. (Pl. S.t ¶ 24). Moreover, despite having an address for Jane Craig's sister, Betty Smith, who resided in Chicago, the officers did not contact her.

Despite the fact that the officers could find no information to connect Frank Craig to Jane Craig, they decided nonetheless to create a photo array of him. The officers had uncovered two booking photos from 1998 and 2005 of Frank Craig. (Pl. St. ¶¶ 38-40; Def. St. Ex. J). The 1998

photo of Frank Craig showed him in his thirties, while the 2005 photo showed him in his forties. (Pl. St. ¶ 39; Def. St. Ex. J). Inexplicably, the officers selected the 1998 photo instead of the more recent 2005 photo for the array. (Pl. St. ¶ 40). The officers then selected five filler photographs, four of which were of individuals who were at least forty-eight year olds (one of the four was 64 years old). (Pl. St. ¶ 41; Def. Ex. I). All of the filler photographs were of African American men who were bald or mostly balding (although as noted earlier Martinez had reported that the suspect had been wearing a hat and did not describe the suspect's hair profile). (Def. St. ¶ 31; Offense Report). Martinez identified the 1998 photograph of Frank Craig as the alleged robber. (Def. St. ¶¶ 34-35; Pl. St. ¶ 42).

After Martinez's identification, Detective Bruce Kischner, assigned to the Area Five Detective Division, received the original case report from Scott and McNamara. (Pl. St. ¶ 43). Kischner issued an investigative alert for Frank Craig. (Pl. St. ¶ 45; Def. St. ¶ 35). An investigative alert informs police offers who come into contact with a suspect (perhaps on a traffic stop) that there is probable cause to arrest the subject, and the suspect can be arrested without a warrant after the alert is issued. (Pl. St. ¶ 50). Frank Craig was arrested the next day.

To obtain an investigative alert, an officer must submit to a supervisor a report explaining what investigative steps have been taken in the case and the basis of the officer's belief that probable cause exists. (Svilar Dep. at 28-30). Kischner admitted that it would not establish probable cause to obtain an identification by conducting a lineup using photographs that matched the general description of a suspect without any link between the suspect and the crime. (Kischner Dep. at 149, 173, 179-80). Here, Kischner believed that Frank Craig was linked to the crime because he believed

that Frank Craig was a family member of Jane Craig, who rented the vehicle used in the robbery. (Kischner Dep. at 149-150).

After Craig's arrest, he was taken to an interrogation room and questioned by Detectives Phillip Brown and John Hillman. (Pl. St. ¶¶ 52-53). As part of the interrogation, Brown and Hillman informed Craig that they knew he had an accomplice and a sister named Jane Craig. (Pl. St. ¶ 55). Frank Craig informed the detectives that he did not have a sister named Jane Craig. (Pl. St. ¶ 55). At one point in the interrogation, Brown or Hillman attempted to bluff Craig with false information, telling him that he was a liar and that his mother had reported that he had stolen her car. (Pl. St. ¶ 56). Craig informed the detectives that his mother had died ten years ago. (Pl. St. ¶ 56).

At some point during their investigation, both Brown and Hillman spoke with Scott and McNamara. Scott gave detective Brown the impression that he and McNamara had connected Craig to Jane Craig, when in fact Scott had failed to find any such relationship (because, as noted earlier, Jane Craig's relation had died two years earlier). (Brown Dep. at 25). Moreover, both Scott and McNamara gave Detective Hillman the impression that he learned that Craig was one of the suspects after watching the surveillance video of the rental agency. (Hillman Dep. at 55-56, 77).[1]

---

[1] Defendants dispute this characterization of Hillman's testimony. When asked about why he believed Craig to be a suspect, he replied that "my understanding after the brief conversation with Officer Scott is he believed that the person in this car was Frank Craig." (Hillman Dep. at 55). The question immediately following asks Hillman if he ever asked to see the video and he was later asked if he believed "it was important to look at the video that allegedly had the offender in the car that was allegedly used on the scene." (Hillman Dep. at 55). Later, when pressed again on whether Craig was a suspect only because he shared a last name with Jane Craig, Hillman responded that he also was a suspect because "two police officers told me they believed *he was in the car when it was returned.*" (Hillman Dep. at 77). Moreover, Hillman testified that "when the vehicle was returned, there was a subject matching [Craig's] description seated in the vehicle." (Hillman Dep. at 52). This testimony not only supports Plaintiff's factual statement, but does so directly. The purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal

After interviewing Craig, the detectives arranged for Martinez to identify him in a line-up. (Pl. St. ¶ 65). Although Craig was 44 years old at the time, the detectives placed three men aged 25, 28, and 23 in the lineup with him. (Pl. St. ¶ 65). Martinez identified Craig a second time. (Def. St. ¶ 37).

At some point in their investigation, Brown searched the "Accurint" database system to confirm the supposed connection between Jane Craig and Craig. (Pl. St. ¶ 66). Brown, however, found nothing to connect Jane Craig to Craig. (Pl. St. ¶ 66). Although Brown printed out the results of the search, Brown did not retain the results. (Pl. St. ¶ 67-68).

An assistant state's attorney (ASA) conducted a felony review of the charges against Craig. In conducting the review, the ASA spoke with both Martinez, whom he believed to be earnest, and the detectives. (Hogun Dep. at 32)). In discussing the case with the ASA, the detectives told an ASA that the rental car used in the robbery had been rented to Jane Craig and that she had filed a stolen vehicle report with Frank Craig. (Pl. St. ¶ 74). The detectives, however, did not inform the ASA that they had been unable to establish a connection between Jane Craig and Craig. (Pl. St. ¶¶ 75-76). According to the ASA, the detectives shared evidence of their investigation of Craig with him that "suggest[ed] that Craig . . . was a relative or somehow connected to Jane Craig." (Hogan Dep. at 19). The ASA believed, based on the information provided to him from the detectives, that Craig was Jane Craig's brother. (Hogan Dep. at 19, 24).

The detectives led another ASA, who was assigned to prosecute the case, to believe that Craig and Jane Craig were related. (Morris Dep. at 17). When the ASA presented the state's case

_____

arguments. *Cady v. Sheahan*, 457 F.3d 1057, 1060 (7th Cir. 2006). The Court reminds Defendants that frivolous disputes of factual statements violate Fed. R. Civ. P. 11(b)(4).

to a grand jury, Brown testified in support of the detectives' investigation. Despite never having been able to confirm that Craig and Jane Craig were related, Brown falsely testified before a grand jury that the investigation of the rental car revealed that it had been rented by a relative of Craig. (Pl. St. ¶ 78). Several months later, an investigator for the Cook County State's Attorney's Officer determined that Craig and Jane Craig were not related. (Pl. St. ¶¶ 86-87). The investigator discovered this information using a database that he described as inferior — both in terms of the depth of information provided and the database's ability to gain recent information — to the Accurint database used by the detectives. (Pl. St. ¶¶ 82-83; Finnelly Dep. at 13, 22-23). Despite the investigator's finding, the ASA continued to trial based on Martinez's identifications. (Def. St. ¶ 45).

After the bench trial, a judge found Frank Craig not guilty. (Pl. St. ¶ 90). Plaintiff then filed this suit.

## II.  Standard of Review

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct., 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of demonstrating there is no genuine issue of material fact, and judgment as a matter of law should be granted in their favor. Fed. R. Civ. P. 56(c). Once the moving party has met the initial burden, the nonmoving party must then "go beyond the pleadings" and "designate specific facts showing that there is a genuine [material] issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). The nonmoving party must offer more than a mere scintilla of evidence to survive summary judgment, and conclusory allegations are insufficient to defeat a motion for summary judgment. *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). *Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir.2005). During the Court's review, it must view all evidence and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

### III. Analysis

#### A. False Arrest

In order to for a false arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause to arrest him. *McBride v. Grice*, 576 F.3d 703, 706 (7th Cir. 2009). The existence of probable cause thus serves as an absolute bar to a § 1983 claim for false arrest. *Id.* Moreover, the doctrine of qualified immunity provides an additional layer of protection for the police. Qualified immunity protects officers who act in a way that they reasonably believe to be lawful. *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). In other words, if an officer makes a reasonable mistake in determining whether there was probable cause to arrest an individual, qualified immunity will protect the officer. *Fox v. Hayes*, 600 F 3.3d 819, 833 (7th Cir. 2010); *Gonzalez*, 578 F.3d at 540. When the issue of qualified immunity cannot be disentangled from the disputed facts, however, the issue cannot be resolved without a trial. *Gonzalez*, 578 F.3d at 540.

Police officers have probable cause to arrest an individual when the facts and circumstances within their knowledge are sufficient to warrant a prudent person to believe that the suspect has committed a crime. *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000). The determination depends not on the facts as an omniscient observer would perceive them or what are

9

later revealed to be the facts, but rather on how the facts would have appeared to a reasonable person in the position of the arresting officer. *Gonzalez*, 578 F.3d at 537.

Generally, once a credible eyewitness informs an officer a crime has been committed, the officer has probable cause to arrest the suspect. *See, e.g., Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003); *Woods*, 234 F.3d at 996-97; *Tangwall v. Stuckey*, 135 F.3d 510, 519 (7th Cir. 1998). Where it is reasonable for the officers to believe that the eyewitness is telling the truth and has made an accurate identification if the eyewitness is not familiar with the suspect, they need not take additional steps to corroborate the information. *Gramenos v. Jewel Co.*, 797 F.2d 432, 439 (7th Cir. 1986). On the other hand, police officers may not close their eyes to facts that would clarify the circumstances of an arrest, particularly where it is not clear whether a crime was committed or who committed the crime. *Fox*, 600 F.3d at 834-35; *Phelan v. Village of Lyons*, 531 F.3d 484, 488 (7th Cir. 2008); *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1016 (7th Cir. 2006); *Guzell v. Hiller*, 223 F.3d 518, 520 (7th Cir. 2000); *Haywood v. City of Chicago*, No. 01 C 3872, 2002 WL 31545883, at * 2 (Nov. 15, 2002).

The Defendants argue that Martinez's identification of Craig in the photo array is both the beginning and end of the probable cause analysis. Once Martinez credibly pointed to Craig, they argue that they had probable cause to arrest him. But the facts are not so straightforward as the Defendants insist. In this case, Scott and McNamara did close their eyes not only to other exculpatory information but also to facts that cast doubt upon the accuracy of Martinez's identification.[2]

---

[2] At the time of the arrest, only Defendants Scott and McNamara had knowledge of the shortcomings of their investigation. The remaining Defendants relied upon representations made by Scott and McNamara when they arrested Craig. Officers may rely on information provided to

In this case, Martinez provided the officers with a reliable lead by obtaining the license plate number of the car that robbed him, which had been rented by Jane Craig. Unfortunately, Jane Craig eluded the officers' attempt to nab her when she returned the car. Still, the officers were able to review surveillance video of Jane Craig returning the rental car. Craig, however, did not appear in that video, but another of the potential suspects did — and the officers failed to obtain a copy of that video. Moreover, despite the fact that Craig did not appear in the surveillance video, Scott and McNamara led Kischner (who issued the investigative alert that caused Craig to be arrested), Brown and Hillman to believe that Craig was in fact in the rental car when it was returned — a fact that was demonstrably false.

When Jane Craig refused to cooperate with the officers' investigation, they discovered a six-year-old incident report that identified Jane Craig and "Frank Craig" as victims. The "Frank Craig" of the incident report listed a California address. In what can best be described as rampant speculation, the officers concluded that Craig, who had an Illinois address, might be the same Frank Craig listed as a victim on Jane Craig's police report. If the connection between the "Frank Craig" of the six-year-old police report and Craig were not tenuous enough, the officers actually tried and failed to prove that the two were in fact related. In fact, the officers uncovered facts to suggest the

_____

them by fellow officers and so long as that reliance is reasonable and the information provides a basis for probable cause, the officer who relies on a fellow officer's representation is immune from a false arrest claim. *See Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679-80 (7th Cir. 2007). The record is devoid of evidence that would demonstrate that at the time of the arrest the remaining Defendants had reason to doubt the adequacy or truthfulness of Scott and McNamara's investigation. Thus, the remaining Defendants were entitled to rely on their representations, which did provide a basis for probable cause. For the remainder of Subsection III.A, the Court uses "officers" or "Defendants" to refer only to Defendants Scott and McNamara. The Court GRANTS the remaining Defendants' Motion for Summary Judgment on Craig's False Arrest Claim.

two "Frank Craigs" were not the same person. Craig's arrest history, for example, revealed that in 1998 (two years prior to the incident report) and 2005 (five years after the incident report) he did not have a California address. Moreover, the officers never questioned or sought to question Jane Craig's sister, who at least in 2000 did reside in Chicago. Despite the fact that Scott and McNamara could find no link between Craig and the "Frank Craig" of the six-year-old police report, they led Kischner, Brown, and Hillman to believe that they had in fact found a relationship between Jane Craig and Craig — another fact that was demonstrably false.

Probable cause must rest on some reasonable belief, and although "a loose concept, . . . it leaves no room for the absurd." *Fox*, 600 F.3d at 834. Still, despite the fact that the Plaintiff shared nothing in common with the "Frank Craig" on the 2000 incident report other than his name and his race, the officers persisted in believing him to be the same man. So the officers manipulated a photographic lineup to invite Martinez to identify Craig. Even though they had a recent photo of Craig, they used a photo that was eight years out of date — one that placed him at the age Martinez believed the suspect robber to have been. In addition, the officers stacked the photographic array with photos of individuals who were a decade or more older than Martinez suspected the robber to have been (including one 64 year old man who may have been 30 years older than the man who robbed Martinez). It was only then that Martinez identified Craig.

As noted earlier, probable cause turns upon the facts and circumstances known to the officer at the time of the arrest. It is a practical, common-sense determination that becomes a question for a jury "'if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.'" *Sornberger*, 434 F.3d at 1013-1014 (quoting *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993)). Where police officers manipulate the evidence,

present a one-sided version of events, or turn a blind-eye to the facts that would clarify the basis of a subjective belief, the record will not necessarily "support a conclusion that [the arresting officers] decided, in an objectively reasonable fashion, that they had probable cause" to make an arrest. *Sornberger*, 434 F.3d at 1014-15.

In *Sornberger*, the police investigated a bank robbery. The officers began reviewing surveillance footage of the bank robbery. One of the bank employees remarked that the robber looked like an acquaintance of his, though the employee later viewed the footage from a different angle and concluded that he was less sure of the likeness. *Sornberger*, 434 F.3d at 1010. The suspect, however, did not match a physical description of the bank robber given earlier by the only eyewitness to the crime. *Id.* at 1010-11. The officers approached a state's attorney to obtain an opinion on whether there was probable cause to arrest the suspect, and provided a one-sided version of the facts. *Id.* at 1015-16. Among other things, the officers misled the state's attorney by stating that they suspected a person "based upon a generalized description of the bank robber." *Id.* at 1015. The officers did not, however, inform the state's attorney that the single eye-witness gave a description of the bank robber that did not in fact match the suspect. *Id.* Nor did the officers inform the states attorney that the employee who viewed the video surveillance qualified his opinion that the suspect matched the person on the video. *Id.* Finally, the officers never showed the state's attorney the actual tape. *Id.* In concluding that the officers were not entitled to qualified immunity, the court noted that the record is "susceptible to the view that the officers themselves realized the weakness of their case, and therefore manipulated the available evidence to mislead the state prosecutor into authorizing [the suspect's] arrest . . . [and that ] this conduct . . . creates serious factual issues." *Id.* at 1016.

The similarities between the officers' investigation of Craig and the investigation of the suspect in *Sornberger* are plain. Like the officers in *Sornberger*, the officers here manipulated the evidence so that the weakness of their case against Craig was withheld from the decision makers. Among other things, the officers misled Kischner into believing that they had discovered a link between Craig and Jane Craig when in fact not only had they failed to establish such a link but also had evidence tending to refute any connection between Craig and Jane Craig (namely the fact that Craig resided in Illinois and not in California, and had resided in Illinois close to the time that the "Frank Craig" of the 2000 incident report resided in California). The officers further misled Kischner into believing that they had witnessed Craig on the video surveillance capturing the return of the rental car used in the robbery. And like the officers in *Sornberger*, the officers here failed to show the video to the Detective Kischner. Finally, in *Sornberger*, the officers appeared to choose a path of least resistance in order to effectuate Craig's arrest. In *Sornberger*, the officers originally approached an United States Attorney to sanction the suspect's arrest, but were rebuffed. *Sornberger*, 434 F.3d at 1015. The officers then instead approached a state's attorney, presenting "incomplete and one-sided" information. *Id.* Here, the officers, perhaps realizing the weakness of their case, did not even attempt to obtain a warrant, instead seeking an investigative alert. A reasonable jury could conclude from these facts that the officers manipulated the evidence and turned a blind eye to evidence that tended to indicate that Craig was not the correct suspect.

Nonetheless, after the officers ignored exculpatory information about Craig and withheld that information from the descisionmaker, Martinez identified Craig as the man who robbed him. There are, however, reasons for the officers to believe that Martinez's identification was not accurate — and therefore it cannot supply probable cause to arrest Craig.

An unduly suggestive identification procedure does not necessarily intrude upon constitutionally protected interests. *Manson v. Brathwaite*, 432 U.S. 98, 113 n.13, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (discussing the admissibility of identification evidence at trial). Rather, even an unduly suggestive identification procedure may still establish probable cause if, under the totality of the circumstances, the identification was reliable. *United States ex. rel. Hudson v. Brierton*, 699 F.2d 917, 923-94 (7th Cir. 1983). Although an identification procedure may be suggestive, the principal question, for purposes of the admissibility of an identification, is whether there is a "very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 18 L.Ed.2d 1199 (1967).[3] To assess the reliability of an identification, courts look to the opportunity of the witness to view the criminal, the witness's degree of attention, the accuracy of the witness's description of the criminal, the level of certainty demonstrated by the witness at the time of the identification, and the time between the crime and the identification. *Id.* at 199.

In this case, Plaintiff has demonstrated a genuine issue of material fact exists regarding whether the identification procedures used were unduly suggestive. First, the Defendant Officers used a dated photo of Craig in the photographic array, even though the image they used may not accurately have reflected their suspect's present appearance. Inexplicably the officers chose to use an eight-year old photograph of Craig in his thirties, rather than a one-year old photograph of Craig in his forties. In other words, the Defendant Officers manipulated Craig's appearance in the

---

[3] Defendants argue that relitigation of this issue is barred by the doctrine of collateral estoppel. In Illinois, courts do not give preclusive effect to an issue unless there has been a final judgment on the merits, meaning that the potential for appellate review has been exhausted. *Ballweg v. City of Springfield*, 114 Ill.2d 107, 113, 499 N.E.2d 1373 (1986). Although the time for Craig to appeal has passed, he had no reason to appeal because the trial judge found him not guilty. Thus, the judgment of the state trial court never became final. *People v. Mordican*, 64 Ill. 2d 257, 261, 356 N.E.2d 71 (1976). Defendants' argument to the contrary is without merit.

photograph they showed to Martinez so he would more closely match the description given to them by Martinez of an African American male in his thirties. The officers argue that Craig's appearance in the photograph used in the array "was not significantly different" from the photograph taken of Craig approximately a year before the robbery. Whether the photograph the police used accurately represents Craig, however, is a factual question. A reasonable jury could conclude that the eight-year-old photograph of Craig did not accurately match his actual appearance. And if the jury so concluded, it could reasonably conclude that the identification by Martinez was unduly suggestive.

In addition to using a dated photograph of the suspect so that he more closely matched the description of the victim, the officers stacked the photographic line up with photos of persons who did not match the description of the victim. The Defendants defend the photographic array by pointing to the height, weight, and hairstyle of the individuals from the filler photographs, but make not a single mention of their ages. *See Def. Br. 7-9.* In this case, the officers selected three photographs of men who were 48 years old. One individual used in the filler photographs was 64 years old, absurdly nearly double the age Martinez suspected the robber to be. In short, the array limited Martinez to two potential suspects that matched the description he had given the police at the time of the crime, and may as well have drawn an arrow pointing on Craig's photograph inviting Martinez to select him. Where officers manipulate a lineup or array to make the alleged suspect's appearance stand apart from the other persons in the lineup or array, they employ an unduly suggestive identification procedure. *See, e.g. In re Mazur*, No. 06 M 295, 2007 WL 2122401 (N.D. Ill. Jul. 20, 2007) (finding procedure unduly suggestive where authorities altered suspect's clothing so that he would stand out from others in the lineup); *Finawall v. City of Chicago*, 490 F. Supp. 2d 918, 923-24 (N.D. Ill. 2007) (finding procedure unduly suggestive where victim reported that suspect

had short hair and authorities placed only one short-haired suspect in the photo array). Single-photograph displays are rightly viewed with suspicion. *Manson*, 432 U.S. at 116 (holding that "identifications arising from single-photograph displays may be viewed in general with suspicion."); *United States v. Rutledge*, 40 F.3d 879, 889 (7th Cir. 1994) (finding a single photograph identification unduly suggestive), *rev'd on other grounds*, 517 U.S. 292, 116 .Ct. 1251, 134 L.Ed.2d 419 (1996). A reasonable jury could view the photographs selected by the police and conclude that none of them but for two match the Martinez's description of a thirty-something African American male, and therefore the array was unduly suggestive.

The Court cannot conclude that Martinez's identification remained reliable despite the unduly suggestive procedures. Rather, the factors set forth in *Biggers* strongly suggest that Martinez's identification was not reliable. Although Martinez claims the area in which he was robbed was well-lit, Craig points out that the sun had already set. At best, the lighting conditions were less than ideal. Additionally, the robbery occurred quickly, affording Martinez only a brief glimpse of his assailant. Unlike the witness in *Biggers*, Martinez could provide only a basic general description of the robber, failing to identify his build, complexion, facial features, voice, or hair pattern. *Cf. Biggers*, 409 U.S. at 200 (noting that man provided detailed description of assailant and weapon, including complexion, skin texture, voice, build, and hair pattern). Instead Martinez was able to provide only the most general of descriptions of the man who robbed him — identifying his only race, age, height, and weight. One of the Defendants testified that it would be improper to conduct a lineup based solely on the fact that an individual matched the general description of a suspect (which is all the evidence Scott and McNamara had when they conducted the lineup). Moreover, immediately prior to the robbery, Martinez was focused on the damage to his car — as the robber created a distraction

to divert his attention, and during the robbery Martinez was faced with a threat of violence. *Cf.*
*United States v. Cord*, 654 F.2d 490, 493 (7th Cir. 1981) (holding that where victim was not
distracted by threat of violence and provided a detailed description of assailant her identification
became more reliable). In short, a reasonable jury could conclude that the stress of being robbed,
the distraction created by the accident immediately prior to the robbery, the brevity of the crime, and
the nighttime conditions under which the crime occurred all detracted from Martinez's opportunity
to view the robber and the degree of attention to which he paid the robber. Finally, although the
record contains evidence that Martinez was "sincere" in his identification, sincerity is not the
equivalent to certainty. The record contains no evidence regarding Martinez's certainty in selecting
Craig's photograph from the lineup. In light of Martinez's general description of the robber, the
difficult and brief conditions under which he viewed him, and the complete absence of information
linking Craig to the crime, the Court cannot say that his identification is reliable, given the
suggestiveness of the array.

Nor are the Defendant Officers entitled to qualified immunity. As noted earlier, if the
Defendant Officers made a reasonable mistake in believing that they had probable cause to arrest
Craig, then they would be entitled to qualified immunity. Taken in the light most favorable to Craig,
the record contains facts sufficient to demonstrate that the Defendant Officers not only withheld and
buried exculpatory evidence but also provided false statements when they sought approval for the
issuance of the investigative alert that led to Craig's arrest. The facts taken in the light most
favorable to Craig also suggest the Defendant Officers manipulated the photographic array in two
different ways to single Craig out in order to produce a positive identification. No reasonable officer
could believe that withholding exculpatory evidence from and making false statements to the

decisionmaker and relying upon a suggestive photographic array could provide a basis for probable cause.

The Court DENIES the Defendants Scott and McNamara's Motion for Summary Judgment on Plaintiff's False Arrest claim.

B.    *Malicious Prosecution Claim*

To prevail on a malicious prosecution claim under Illinois law, a plaintiff must prove: (1) the commencement or continuance of judicial proceedings against him by the defendant; (2) a lack of probable cause; (3) malice in instituting the proceedings; (4) termination of the proceedings in the plaintiff's favor; and (5) damages resulting from the proceedings. *Mosley v. City of Chicago*, 614 F.3d 391, 399 (7th Cir. 2010).

Defendants first argue that the existence of probable cause dooms Craig's malicious prosecution claim. The existence of probable cause bars a claim for malicious prosecution, much like it bars claims for false arrest. *Holmes*, 511 F.3d at 682. However, when filing charges against a person, an officer has had "an opportunity to reflect on the nature and ramifications of the accused's conduct" that he did not have when making the arrest. *Id.* at 683. Thus, an officer must have probable cause for each charge filed against a suspect at the time the charges are filed. *Id.*

As noted earlier, Scott and McNamara lacked probable cause to arrest Craig. After his arrest, Brown and Hillman continued the arresting officers' investigation. Several facts that arose during Brown and Hillman's subsequent investigation only further undermine any reasonable belief that probable cause existed to initiate proceedings against Craig.

First, when Brown and Hillman interrogated Craig, they fabricated stories about stolen vehicles to attempt to elicit a confession. Brown and Hillman invented a story that Craig was a

19

career criminal — that his mother had reported that he had stolen her car. Whether Brown and Hillman had misread the 2000 incident report filed by *victims* Jane and Frank Craig or whether they believed he had "stolen" the rental car from his mother Jane Craig in order to commit the robbery, Craig's response — that his mother had died ten years earlier — punched a hole in their theory that Frank and Jane Craig were related. In addition, when asked about Jane Craig, Craig denied that she was his sister. Although suspects may lie about their involvement in criminal activity,[4] Craig's denials here were about details that, as far has he was concerned, were not related to criminal activity (and thus had no reason to lie). More importantly, Brown and Hillman withheld these exculpatory statements from the state's attorney, who may then have decided that it would be simple to confirm the veracity of Craig's denials and then quickly concluded that the "Frank Craig" the officers had arrested was not Jane Craig's brother and therefore not connected to the car used in the robbery.

Next, Hillman and Brown arranged for Martinez to identify Craig in a lineup. The Detectives rounded up three other people to place in the lineup, all of whom were in their twenties and between 16 and 21 years younger than Craig. Little needs to be said about the suggestiveness of this lineup. Despite stacking the deck, Hillman and Brown did not indicate to the state's attorney that they had used a lineup with persons not even remotely close in age to the principal suspect and instead merely reported that Martinez had identified Craig.

Next, Brown searched a database to establish a link between Craig and Jane Craig. The particular database used by Brown was more comprehensive than the database used by the state's

---

[4] It is telling that the Defendants question Craig's truthfulness during the interrogation when in fact it was Craig telling the truth and the Detectives who were fabricating stories they knew to be false (particularly that Craig had stolen a car from his mother and that they "knew" he had a sister named Jane, when in fact they had been completely unable to confirm such a relation).

attorney investigator that ultimately revealed that the Frank Craig who was related to Jane Craig was in fact deceased. Brown's search resulted in 100 pages of documents, which he printed out during the investigation. Brown, however, chose not to turn over any of the documents he had printed to the state's attorney.

Finally, and most troubling, Scott, McNamara, Brown, and Hillman repeatedly lied about the connection between Craig and Jane Craig. Scott and McNamara lied to Brown and Hillman, informing them that they viewed Craig in the rental car as it was returned and that Craig was related to Jane Craig. Brown and Hillman suggested to multiple state's attorneys that Craig was in fact a relative or otherwise connected to Jane Craig. Brown testified before a grand jury that the car used in the robbery had been rented by a relative of Craig, despite the fact that at a minimum Brown knew that he could not prove the truthfulness of his statement and potentially he demonstrably knew it to be false.

An officer who intentionally provides misleading or false information before trial that is material to a prosecutor's decision to proceed with trial is not entitled to qualified immunity from a malicious prosecution claim. *Newsome v. McCabe*, 256 F.3d 747, 752-53 (7th Cir. 2001); *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988). The Court has detailed statements made by Brown and Hillman to state's attorneys that if credited by a jury provide a reasonable basis to conclude that the detectives knowingly made false or misleading statements to the state's attorneys that were material to the state's attorney's decision to prosecute.[5]

_____

[5] The Defendants point to the fact that even after learning that Craig was not related to Jane Craig, the state's attorneys pressed the case forward and argues that therefore any misleading information they provided was not material to the state's attorneys' decision. Of course, the decision to commence proceedings is different than a decision to continue proceedings that have already commenced. The state's attorney provided no testimony about

Defendants make two additional arguments that merit little attention. First, the Defendants suggest that the proceedings were not terminated in plaintiff's favor. Defendants suggest that Craig must demonstrate that the result of the proceedings were indicative of his actual innocence. It is true that a decision to abandon prosecution under a *nolle prosequi* agreement does not necessarily indicate innocence, but an acquittal does. *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925-26 (7th Cir. 2001).[6] Next, the Defendants suggest that there is no evidence to demonstrate malice. As noted above, a reasonable jury could conclude that Scott, McNamara, Brown, and Hillman knowingly provided false or misleading information material to the state's attorneys' decision to prosecute Craig. That is sufficient to demonstrate malice. It is also sufficient to defeat the Defendants' argument based on the Illinois Tort Immunity Act.

The Court DENIES Defendants Scott, McNamara, Brown, and Hillman's Motion for Summary Judgment on Craig's malicious prosecution claim. The Court GRANTS the remaining Defendants' Motion for Summary Judgment on Craig's malicious prosecution claim.

C.      *Brady Claim*

A due process claim under 42 U.S.C. § 1983 arises when the prosecutor withholds material exculpatory or impeaching evidence that prejudices the accused's right to a fair trial. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1114, 10 L.Ed.2d 215 (1963). *Brady* identifies a right that arises

---

what decision would have been made if the exculpatory information was presented *before* charges were filed. As noted earlier, the state's attorney may have quickly decided to verify Craig's claim that he was not related to Jane Craig before proceeding with any charges. Moreover, the Defendants ignore the fact that they failed to disclose information about the suggestive nature of the identifications to the state's attorneys.

[6]The Defendants seem to recognize their argument was without merit, because they abandon it in their reply.

at trial. *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001). In order to establish the elements of a *Brady*-type due process claim, a plaintiff must demonstrate that: (1) the evidence at issue is favorable to the accused either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; (3) there is a reasonable probability that prejudice ensued. *Carvajal v. Dominguez*, 542 F.3d 561, 566-67 (7th Cit. 2008).

Although Craig was acquitted, his acquittal does not necessarily doom his due process claim. The Seventh Circuit, while expressing doubts about the parameters of *Brady*-type claims where a plaintiff was acquitted, has not foreclosed that such hypothetical plaintiffs could establish prejudice. *See, e.g., Parish v. City of Chicago*, 594 F.3d 551, 554 (7th Cir. 2009); *Bielanski v. County of Kane*, 550 F.3d 632, 644-45 (7th Cir. 2008); *Caravajal*, 542 F.3d at 566-67. This is because a "true constitutional violation is measured with the outcome in mind," and if the decision to go to trial in the first instance would have been altered by the disclosure, a plaintiff might be able to show prejudice. *Carvajal*, 542 F.3d at 570; *see also Parish*, 594 F.3d at 554; *Bielanski*, 550 F.3d at 644-645.

Craig argues that the Defendants failed to disclose: (1) their selection of a dated photograph of him for the photographic array; (2) the 2004 death of Jane Craig's brother, Frank Craig; (3) the surveillance video from the rental car agency; and (4) the results of their investigation, including the results of various database searches performed by the officers and the detectives. Craig argues that if the Defendants had disclosed this evidence to the state's attorney, then the state's attorney would not have elected to prosecute him.

As the Court has noted above, a reasonable jury could conclude that the Defendants did mislead the prosecutor and that the deception may have been sufficient to influence the state's

attorney's decision that probable cause to initiate a prosecution existed. The problem for Craig, however, lies not in the final element of the *Brady* claim, but in the second. Quite simply, although the officers withheld information from or misled the state's attorney, Craig has not demonstrated that they suppressed information from *him*. The Seventh Circuit has held that *Brady* does not extend so far as to provide relief in a situation where "a police officer makes a false statement to a prosecutor." *Harris v. Kuba*, 486 F.3d 1010, 1017 (7th Cir. 2007). *Brady* is a trial right and protects an individuals right to a fail trial "that will enable jurors to determine where the truth lies." *Sornberger*, 434 F.3d at 1029.

Craig was aware of the photograph used in the photographic array — and even moved to suppress his identification based on the procedures the officers used to procure Martinez's identification, and so he cannot argue that the Defendants suppressed that information from him. With respect to other pieces of evidence, Craig argues only that Defendants withheld the information from the state's attorney, not from him. For example, regarding the death of a Frank Craig in 2004, he notes that "all of the Defendants withheld this information from the prosecution." Resp. at 30. Regarding the surveillance video, he notes that Scott and McNamara "falsely told Detectives Hillman and Brown that [he] appeared on the video of the rental car." Resp. at 30. The Defendants' decision to manipulate the evidence they presented to the state's attorney cannot provide the basis for a *Brady* claim.

All that remains, then, is the Defendants' destruction of the results of their searches of various databases in attempting to establish a link between Craig and Jane Craig. Suppression, however, does not occur when the defendant could have discovered the evidence himself through reasonable diligence. *Carvajal*, 542 F.3d at 567. In this case, Craig knew he was not, in fact, related

24

to a Jane Craig who resided in California, and through reasonable diligence could have discovered that the "Frank Craig" who was related to Jane Craig was deceased.

The Court GRANTS the Defendants' Motion for Summary Judgment on Craig's *Brady* claim.

D.    *Failure to Intervene and Conspiracy Claims*

Craig offers little more than boilerplate recitation of the elements of a failure to intervene and conspiracy claims in response to the Defendants' summary judgment motion. Craig states that "[r]esolution of [his false arrest and due process claims] is an essential predicate to whether Defendant officers had a realistic opportunity to intervene " and for that reason they are not entitled to summary judgment. But while a genuine issue of material fact regarding his false arrest and due process claims might be a necessary predicate to the survival of a failure to intervene claim, it is not a sufficient one. Craig points to no evidence that the Defendants had reason to know that their fellow officers were committing constitutional torts. In fact, the evidence he presents suggests just the opposite — Scott and McNamara *misled* the Detectives when presenting evidence implicating Craig to them. Similarly, Craig suggests that "the facts discussed at length above demonstrate that [Scott and McNamara] worked with Defendant Detectives] in order to charge a pursue a criminal case against an innocent man." But merely working together does not demonstrate a conspiracy. Craig points to no evidence to suggest that Scott, McNamara, Brown and Hillman made an agreement.

The Court GRANTS Defendants' Motion for Summary Judgment on Craig's Failure to Intervene and Conspiracy Claims.

IT IS SO ORDERED.

_____3/25/11_____
Dated

Wm. J. Hibbler

Hon. William J. Hibbler
United States District Court